**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WPP LUXEMBOURG GAMMA THREE
SARL, on its own behalf and
derivatively on behalf of Spot
Runner, Inc.,
           *Plaintiff-Appellant,*

              v.

SPOT RUNNER, INC.; NICK GROUF;
DAVID WAXMAN; PETER HUIE,
           *Defendants-Appellees.*

No. 10-55401

D.C. No.
2:09-cv-02487-
DMG-PLA

11399

WPP Luxembourg Gamma Three
Sarl, on its own behalf and
derivatively on behalf of Spot
Runner, Inc.,
            *Plaintiff-Cross-Appellee,*

                    v.

Spot Runner, Inc.; Nick Grouf;
David Waxman; Peter Huie;
Robert Pittman,
        *Defendants-Cross-Appellants,*

                    and

Battery Ventures VI, L.P.;
Battery Investment Partners VI,
LLC; Battery Ventures VII,
L.P.; Battery Investment
Partners VII, LLC; Index
Ventures III (Jersey) L.P.; Index
Ventures III (Delaware) L.P.;
Index Ventures III Parallel
Entrepreneur Fund (Jersey) L.P.;
Roger Lee; Danny Rimer,
                        *Defendants.*

No. 10-55464

D.C. No.
2:09-cv-02487-
DMG-PLA

WPP Luxembourg Gamma Three
Sarl, on its own behalf and
derivatively on behalf of Spot
Runner, Inc.,
            *Plaintiff-Cross-Appellee,*

                    v.

Spot Runner, Inc.; Nick Grouf;
David Waxman; Peter Huie;
Robert Pittman,
                    *Defendants,*

                    and

Battery Ventures VI, L.P.;
Battery Investment Partners VI,
LLC; Battery Ventures VII,
L.P.; Battery Investment
Partners VII, LLC; Index
Ventures III (Jersey) L.P.; Index
Ventures III (Delaware) L.P.;
Index Ventures III Parallel
Entrepreneur Fund (Jersey) L.P.;
Roger Lee; Danny Rimer,
            *Defendants-Cross-Appellants.*

No. 10-55468

D.C. No.
2:09-cv-02487-
DMG-PLA

OPINION

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted
June 6, 2011—Pasadena, California

Filed August 23, 2011

Before: Betty B. Fletcher and N. Randy Smith,
Circuit Judges, and James S. Gwin, District Judge.*

Opinion by Judge Gwin

---

*The Honorable James S. Gwin, District Judge for the U.S. District
Court for Northern Ohio, Cleveland, sitting by designation.

**COUNSEL**

Paul F. Corcoran, Davis & Gilbert LLP; Ben D. Whitwell and Christopher T. Williams, Venable LLP, for plaintiff-appellant WPP.

Douglas John Clark, Boris Feldman, Kelley Kinney, and Louis David Nefouse, Wilson, Sonsini, Goodrich & Rosati, for defendant-appellee Spot Runner.

Alissa Branham, Robert Leo Dell Angelo, Fred Anthony Rowley, Jr., John W. Spiegel, Munger, Tolles & Olson LLP, and Robert A. Sacks, Sullivan & Cromwell, LLP, for defendants-appellees Nick Grouf and David Waxman.

Alissa Branham, Robert Leo Dell Angelo, Fred Anthony Rowley, Jr., and John W. Spiegel, Munger, Tolles & Olson LLP, for defendant-appellee Peter Huie.

Kevin C. Logue and Nicholas J. Begakis, Paul Hastings LLP, for defendant-appellee Robert Pittman.

Michael D. Blanchard, Jordan D. Hershman, and Jennifer M. Sepic, Bingham McCutchen LLP, for defendant-appellees Battery, Index, Roger Lee, and Danny Rimer.

## OPINION

GWIN, District Judge:

Plaintiff-Appellant and Cross-Appellee WPP Luxembourg Gamma Three Sarl ("WPP") appeals from the district court's dismissal of the amended complaint. The district court dismissed the amended complaint under Federal Rule of Civil Procedure 12(b)(6) for having failed to state a claim. Defendant-Appellees and Cross-Appellants ("Defendant-Appellees") cross-appeal the district court's decision to dismiss some of WPP's claims without prejudice.

WPP generally alleges that amidst large operating losses unknown to investors, Spot Runner executives solicited WPP to buy shares in Spot Runner at the same time that executives of the company were selling personally owned shares. WPP says that Spot Runner executives did not disclose their stock sales despite contractual obligations to disclose the sales and despite WPP asking whether these executives were selling. WPP brings securities claims under Section 10(b) of the Securities and Exchange Act of 1934.

The district court exercised jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa. The district court's order dismissing the Plaintiff-Appellant's claims for failure to state a claim is an appealable final determination and we have jurisdiction under 28 U.S.C. § 1291.

## I.  Facts and Background

In 2004, Adam Shaw and Defendant-Appellees Nick Grouf and David Waxman (collectively "Founders") founded Spot Runner. Spot Runner developed and sold an internet-based platform to assist small businesses in creating and placing advertising on cable and broadcast television. Throughout the period relevant to this case, Spot Runner made no profit and had difficulty completing the development of its programs. Defendant-Appellee Nick Grouf is Spot Runner's Chief Executive Officer and is a director of the Company, Defendant-Appellee David Waxman is Spot Runner's Vice-President and is also a director, and Defendant-Appellee Peter Huie is Spot Runner's general counsel.

Founders Grouf and Waxman originally held almost all of Spot Runner's common stock. In early 2006, Spot Runner sold preferred equity interests to Battery Ventures VI, L.P.; Battery Investment Partners VI, LLC; Battery Ventures VII, L.P.; and Battery Investment Partners VII, LLC (collectively "Battery"); and Index Ventures III (Jersey) L.P.; Index Ventures III (Delaware) L.P.; and Index Ventures III Parallel Entrepreneur Fund (Jersey) L.P. (collectively "Index").

In August 2006, WPP invested $10 million in Spot Runner by purchasing newly-issued Series C preferred shares. In purchasing their shares, WPP received the right under a Board Observer Agreement to attend all meetings of Spot Runner's Board of Directors in a non-voting capacity and to receive all materials distributed to Board members. WPP also obtained rights under a Second Amended and Restated Right of First Refusal and Co-Sale Agreement ("ROFR/Co-Sale Agreement" or the "Agreement"). The ROFR/Co-Sale Agreement gave WPP together with Index and Battery—but not Founders Grouf and Waxman—separate rights to match offers to invest in Spot Runner and a right to receive notice if the Founders intended to transfer any of their shares. The Agreement also gave each investor a right to sell its own shares in Spot Run-

ner pro rata with any disposition of common stock by the Founders in a co-sale. Finally, the Agreement included a provision allowing the rights in the Agreement to be waived if sixty percent of the investors voted together, so long as written evidence of the waiver was provided to all the investors. The amended complaint alleges that on several occasions the Founders sold their own shares of Spot Runner but did not disclose the sales to WPP. WPP alleges that the Founders surreptitiously sold their Spot Runner shares, while at the same time encouraging WPP's investment in Spot Runner by keeping those sales secret. WPP claims that the Defendant-Appellants kept the sales secret because WPP enjoyed a strong reputation for technology investments and because Spot Runner used WPP's Spot Runner investments to solicit other investments, which were needed because Spot Runner was losing significant amounts of money.

WPP alleges that in October 2006, shortly after WPP made its initial investment, Founders Grouf and Waxman sold approximately $4 million in shares without disclosing this sale to WPP. WPP says this sale violated the ROFR/Co-Sale Agreement because Grouf and Waxman were under a contractual duty to disclose the sale to WPP.

In the transaction that is the focal point of this suit, WPP alleges that in the spring of 2007, the Founders again sold shares without proper notice and also wrongly induced WPP to purchase additional shares of Spot Runner by failing to disclose the Founders' sales. In March 2007, Spot Runner sold $32 million in common stock in a new primary offering to an institutional investor. On April 17, 2007, Spot Runner informed WPP of the offering; it also asked WPP and other investors if they wanted to purchase their pro rata portion of this offering to maintain their ownership percentage in Spot Runner.

On May 10, 2007, before WPP had responded to the offer to purchase shares as part of the primary offering, Spot Run-

ner sent WPP a letter stating that the same institutional investor wanted to buy existing shares in a secondary offering. Spot Runner said it was soliciting shares to fill this sale from "all preferred stockholders and the founders." The letter instructed WPP to return an attached "Indication of Interest and Waiver" form and it also included a waiver notice, saying that signing the form acknowledged that the rights of co-sale and first refusal under the ROFR/Co-Sale Agreement were being waived by and among the investors.

On May 14, 2007, Founder Nick Grouf sent WPP an email discussing WPP's potential investment options in light of the primary and secondary offerings. Ultimately, in a May 15 email to Nick Grouf, which also carbon copied Peter Huie (Spot Runner's general counsel),WPP told Grouf that WPP would purchase additional shares in the primary offering to maintain its ownership level. On May 18, 2007, WPP sent an email to Huie to confirm that the purchase of new shares would adequately maintain WPP's ownership percentage in Spot Runner. Huie replied on the same day, confirming that the purchase would slightly increase WPP's ownership stake. Huie also asked if WPP was passing on the option to sell shares as part of the secondary offering. WPP confirmed that it was not going to sell any shares and also stated that the waiver form was being returned.

On the next business day—May 21, 2007—WPP began a new email chain with Huie, with the subject line "WPP Share Purchase." In this May 21 email chain, WPP asked Huie whether there was "an existing investor and/or founder selling existing shares related to this offering? If so, who is selling shares and how many shares are they selling[.]" Huie replied that "[t]his offering does not involve the sale of any existing shares. It is an entirely new issuance by the Company."

On May 23 and 24, 2007, WPP purchased 383,111 additional shares of common stock from Spot Runner at $4.66 per share, for a total new investment of $1,785,297; WPP also

executed a waiver form declining to sell its own shares as part of the secondary offering. While WPP was purchasing shares and unbeknownst to WPP, Founders Grouf and Waxman, as well as Battery and Index, sold shares to the institutional investor in the secondary offering. WPP alleges that as part of the secondary offering, Grouf sold 529,939 shares for $2,450,007 and Waxman sold 123,392 shares for $575,007.

In addition to the spring 2007 sales, WPP alleges that in January 2008, Founders Grouf and Waxman, as well as Battery, Index, and outside director Robert Pittman, again sold a large number of Spot Runner shares without providing proper notification under the ROFR/Co-Sale Agreement. WPP also alleges that in March 2008, the Founders, Index, Battery, and Pittman again sold additional shares as part of a secondary offering. WPP acknowledges that Spot Runner gave it proper notice of this sale, but Spot Runner limited the number of shares WPP could sell, whereas some Defendants sold many more shares. In total, as part of this May 2008 transaction, WPP sold 152,273 shares of Spot Runner at $6 per share, for approximately $900,000 total.

WPP claims Spot Runner, Grouf, and Waxman did not disclose Spot Runner's poor financial performance and condition at Board meetings. WPP says that in March 2009, Spot Runner finally admitted to the shareholders that the Founders had been selling their shares at a time when the Company was in poor financial condition and needed outside capital. Specifically, WPP alleges that the Founders admitted that Spot Runner had approximately $70 million in losses and less than $15 million in revenue in 2007 and 2008.

On April 9, 2009, WPP filed a complaint in the United States District Court for the Central District of California on its own behalf and derivatively on behalf of Spot Runner. On October 13, 2009, WPP filed an amended complaint, asserting securities fraud claims for violations of Section 10(b) and S.E.C. Rule 10b-5 based on material omissions and scheme

liability against all Defendants, violations of Section 10(b) and Rule 10b-5 for insider trading against Defendant Spot Runner, control-person liability under Securities Exchange Act Section 20(a) against Nick Grouf, and a variety of pendent claims brought under California state law.

On January 27, 2010, the district court dismissed the Section 10(b) claims and declined to reach the state law claims. In ruling on the Defendant-Appellees' motions to dismiss, the district court found: (1) with regard to the Rule 10b-5(b) omission claims that only Founders Grouf and Waxman had a duty to disclose their sale of shares, that WPP did not plead enough facts to adequately allege scienter as to the Founders, and that WPP did not adequately plead loss causation; (2) with regard to the Rule 10b-5(a) and (c) scheme claim, that any claim for scheme liability fails because it is repetitive of the omission claim and because it fails to adequately plead scienter; and (3) that the Rule 10b-5 insider trading claim against Spot Runner fails because it does not adequately allege facts showing that Spot Runner failed to disclose the Founders' sale with intent to induce WPP to invest. The district court granted WPP leave to amend some of the claims, but noted that the amended complaint would be dismissed without prejudice if a second amended complaint was not filed by February 24, 2010.

On February 12, 2010, WPP filed notice of its intention not to amend its complaint; WPP also requested that the district court dismiss the complaint without prejudice. On February 25, 2010, and over the Defendants' objections, the district court dismissed portions of the amended complaint without prejudice and the current appeal and cross-appeal followed.

## II.  Standard of Review

We review de novo a district court's grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and for failure to allege fraud with partic-

ularity under Federal Rule of Civil Procedure 9(b). *See, e.g.*, *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir. 2001).

In reviewing the adequacy of the complaint, we must accept all well-pleaded allegations as true. *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). However, the "[f]actual allegations [in the complaint] must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In other words, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) (internal quotation omitted).

"At the pleading stage, a complaint stating claims under section 10(b) and Rule 10b-5 must [also] satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Under Federal Rule of Civil Procedure 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires that a party "state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

As to the cross-appeal, a district court's decision to dismiss without prejudice is reviewed for abuse of discretion. *Smith-Kline Beecham*, 245 F.3d at 1051; *Stevedoring Servs. of*

*America v. Armilla Int'l B.V.*, 889 F.2d 919, 921 (9th Cir. 1989).

## III.   Analysis

**[1]** Section 10(b) of the Securities Exchange Act of 1934 "provides that it is unlawful 'to use or employ in connection with the purchase or sale of any security on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance . . . .' " *In re Read-Rite Corp.*, 335 F.3d 843, 845 (9th Cir. 2003) (quoting 15 U.S.C. § 78j(b)), *abrogated on other grounds as recognized in South Ferry, L.P.* 542 F.3d at 782-84. To state a securities fraud claim, a plaintiff must plead: " '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.' " *Thompson v. Paul*, 547 F.3d 1055, 1060 (9th Cir. 2008) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008)).

A.   *Rule 10b-5(b) omission claim against Founders Grouf and Waxman*[1]

WPP asserts omission claims under Rule 10b-5(b) against Founders Grouf and Waxman. The district court dismissed these claims, holding that WPP did not adequately allege scienter or loss causation.

---

[1]The parties do not dispute that information regarding whether the Founders were selling their shares as part of the May 2007 secondary offering is material. Additionally, if a claim for securities fraud is based upon an omission, a plaintiff need not show reliance. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972); *Zucco Partners*, 552 F.3d at 990; *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005).

i.    *Duty to Disclose*

**[2]** Under Rule 10b-5(b), a defendant can be liable for the omission of material information if he or she has a duty to disclose that information. *See Chiarella v. United States*, 445 U.S. 222, 235 (1980); *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 938 (9th Cir. 2009). A duty to disclose "does not arise from the mere possession of non-public information." *Chiarella*, 445 U.S. at 235.

WPP says the Defendant-Appellees had a duty to disclose that Founders Grouf and Waxman were selling shares of Spot Runner at a time that Spot Runner was losing money. In support of its argument that Spot Runner and the Founders had a duty to make disclosures, WPP first claims that its relationship with the Founders created a duty to disclose, because it was a significant investor in a closed company and because the Founders knew that WPP believed the Board Observer and ROFR/Co-Sale Agreement would provide notice of any Founder stock sale. Second, WPP argues that the ROFR/Co-Sale Agreement directly required Defendants to disclose the Founders' sales.

As to a broader duty based upon the parties' relationship, generally "parties to an impersonal market transaction owe no duty of disclosure to one another absent a fiduciary or agency relationship, prior dealings, or circumstances such that one party has placed trust and confidence in the other." *Paracor Fin. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996). "A number of factors are used to determine whether a party has a duty to disclose: (1) the relationship of the parties, (2) their relative access to information, (3) the benefit that the defendant derives from the relationship, (4) the defendant's awareness that the plaintiff was relying upon the relationship in making his investment decision, and (5) the defendant's activity in initiating the transaction." *Id.* (citing *Jett v. Sunderman*, 840 F.2d 1487, 1493 (9th Cir. 1988)).

Here, the close relationship between WPP and Founders in a closed company, the Founders' knowledge that WPP was relying upon the protections of the ROFR/Co-Sale Agreement in making their share purchase, the Founders' superior access to information, and the benefit the Founders derived from the business relationship with WPP suggest that some general duty to disclose may exist. *See, e.g.*, *Allstate Life Ins. v. Robert W. Baird & Co.*, 756 F. Supp. 2d 1113, 1137-38 (D. Ariz. 2010) (finding a duty to disclose in business transactions in a closed corporation). However, given that the duty to disclose is more directly established under the ROFR/Co-Sale Agreement, it is unnecessary to fully resolve whether the relationship between the Founders and WPP established a generalized duty to disclose.

**[3]** WPP also argues that the provisions of the ROFR/Co-Sale Agreement and the Board Observer Agreement directly establish a duty among the Founders to disclose their participation in the spring 2007 secondary offering. There are several provisions of the ROFR/Co-Sale Agreement relevant to this issue. First, subsection 1.2 of the Agreement, entitled "Notice of Proposed Transfer," requires that the Founders provide notice to Spot Runner and investors, among others, before they transfer any of their own shares to a third party. This notice provision is important, because under the Agreement, Spot Runner possesses a right of first refusal with regard to these shares, and if Spot Runner declines to exercise that right, each of the investors has the right to purchase a pro rata portion of the shares. Further, to the extent that Spot Runner declines to exercise its right of first refusal and the investors decline to exercise their purchase rights, the investors each possess a co-sale right, allowing them to sell their own shares pro rata with any disposition of common stock by the Founders.

**[4]** The ROFR/Co-Sale Agreement also contains a waiver provision in subsection 3.9, which states that the provisions of the Agreement could be waived by sixty percent of investor

shares "voting together." However, in an ambiguity that is crucial to this suit, it is not clear whether an investor vote that waives portions of the ROFR/Co-Sale Agreement must include the ballot of all investor shares, or whether sixty percent of the shares may waive the rights of other investors. The Agreement also provides that any sale of shares by a Founder contrary to the provisions of the Agreement would be void and that "[t]he [selling] Founder shall provide [ ] each Investor with written evidence that such requirements have been met or waived prior to consummating any sale, assignment or other transfer of Securities . . . ."

   **[5]** WPP says Defendants Grouf and Waxman had a contractual duty to disclose that they were selling shares and to disclose that provisions of the ROFR/Co-Sale Agreement were being waived with regard to the secondary offering. In response, the Defendant-Appellees argue that the Founders had no duty to disclose because Battery and Index, who owned sixty percent of the shares held by investors, allegedly waived WPP's right to receive notice of the Founders' sales and also cancelled WPP's right to notice of the fact that the right to notice itself was cancelled. The Defendant-Appellees say that Battery's and Index's waiver occurred when each separately completed an "Indication of Interest" form, which stated:

> Please note that by signing this Indication of Interest, you acknowledge that the Rights of First Refusal and Co-Sale Rights under that certain Second Amended and Restated Right of First Refusal and Co-Sale Agreement dated September 1, 2006 by and among the Company, the preferred stockholders and the founders are being waived on behalf of all preferred stockholders with respect to this sale to the Investor.

WPP disagrees and says that Battery and Index could not cancel both WPP's right to receive notice of Grouf's and Waxman's stock sales and WPP's notice of waiver. WPP argues

that in any event, proper waiver of any section of the Agreement requires that all shareholders vote together.[2]

**[6]** The Defendant-Appellees' argument that the notice provisions of the Agreement could themselves be waived is undercut by the very language of the Agreement. For example, subsection 3.1 requires that "[t]he Founder[s] shall provide the Company and each Investor with written evidence that such requirements have been met or waived prior to consummating any sale," and provides that "no Securities shall be transferred on the books of the Company until such written evidence has been received by the Company and each Investor." Given the specificity of this subsection, Founders Grouf and Waxman could not reasonably have believed that Battery and Index could waive each investor's right to receive written notice that the right of first refusal or co-sale had been met or waived prior to consummating any sale. In addition, the Defendant-Appellees' argument ignores the actual language of the waiver in the indication of interest form, which includes no indication that the notice of waiver provisions were also being waived. A straightforward reading of this contract would demand that WPP receive at least one notice of waiver.

---

[2]The Defendant-Appellees also seem to argue that WPP concedes in the amended complaint that waiver forms were completed by Index and Battery on behalf of all of the investors. However, WPP does not concede this point and instead only alleges that "Founders Grouf and Waxman agreed with Battery and Index that Battery and Index would purport to waive WPP's rights pursuant to the ROFR and Co-Sale Agreement to receive notice of the Founders' Spring 2007 Sales, in exchange for Battery and Index participating in the Spring 2007 Sales." It is thus unclear at this juncture whether the waiver form was even signed by Index and Battery. Indeed, although Defendant-Appellees filed documents supporting their claim, they have conspicuously not filed any form actually signed by Index or Battery. Given that the Defendant-Appellees filed submission supporting their claim in other regards and thus such waiver would presumably be in the Defendant-Appellees' possession, some inference may be safely made that such a waiver was not actually completed at all.

**[7]** Second, WPP alleges that this waiver was ineffective because subsection 3.9 of the ROFR/Co-Sale Agreement provides that any waiver must be made by the Investors "voting together." WPP argues that the term "voting together" means that all of the investors needed to participate in the vote, whereas the Defendant-Appellees argue that only sixty percent of the investors need vote if they all vote the same way. The contested language is:

> Neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by written instrument signed by the party against whom enforcement of any such amendment, waiver, or discharge or termination is sought; provided, however, that the holders of sixty percent (60%) of the Shares held by the investors voting together may waive, discharge, terminate, modify or amend, on behalf of all Investors, any provisions hereof.

Under California contract law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ." Cal. Civ. Code § 1639. Extrinsic evidence may not be used to contradict unambiguous express contractual terms. *See Bank of the West v. Valley Nat'l Bank of Ariz.*, 41 F.3d 471, 477 (9th Cir. 1994) (applying California law).

**[8]** Although the language of the ROFR/Co-Sale Agreement is somewhat ambiguous, WPP gives the far more natural interpretation.[3] Importantly though, and aside from a resolu-

---

[3]For example, the doctrines of the last antecedent and *noscitur a sociis* support WPP's interpretation of subsection 3.9 of the Agreement. *See United States v. Williams*, 553 U.S. 285, 294 (2008) (stating that "the

tion of the actual meaning of this provision of the Agreement, where the language of the contract is unclear, a court must look to evidence outside the pleadings. As such, resolution of the disputed meaning of the contract on a motion to dismiss is inappropriate. *See, e.g.*, *Seed Servs., Inc. v. Windsor Grain, Inc.*, 2011 WL 445002, at *3 (E.D. Cal. Feb. 8, 2011). If WPP's interpretation of the contract proves to be the intended meaning, then it will have adequately shown that an opportunity for a vote by all shareholders was required before the rights in ROFR/Co-Sale Agreement could be waived; that this vote did not occur; and accordingly, that the Founders violated a duty founded upon the Agreement to properly disclose their sales in the secondary offering.

### ii. Scienter

[9] Under the PSLRA, a plaintiff in a securities fraud case must also plead sufficient facts supporting a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "Under this provision, the mental state required for securities fraud liability is distinct from the level of pleading required to infer that mental state." *South Ferry*, 542 F.3d at 782 (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 975 (9th Cir. 1999)). The requisite state

---

commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated."); *Am. Fed. of Gov't Emps., AFL-CIO Local 2152 v. Principi*, 464 F.3d 1049, 1055 (9th Cir. 2006) ("Under the doctrine of the last antecedent, qualifying phrases are to be applied to the words or phrase immediately preceding the qualifier and are not to be construed as modifying more remote phrases."); *ACS Sys., Inc. v. St. Paul Fire & Marine Ins. Co.*, 147 Cal. App.4th 137, 150 (Cal. Ct. App. 2007) (applying the last antecedent rule to interpretation of contracts under California law). Using both of these tools, "voting together" more reasonably modifies the adjacent "investor," rather than modifying the non-adjacent and not clearly associated "holders of sixty percent (60%) of the Shares" as the Defendant-Appellees claim. The interpretation of the Agreement that Defendant-Appellees' advocate is strained and unnatural.

of mind for a securities fraud case is scienter, which is knowing or intentional conduct, or reckless conduct "to the extent that it reflects some degree of intentional or conscious misconduct, or what we have called deliberate recklessness." *Id.* (quoting *In re Silicon Graphics*, 183 F.3d at 977).

To satisfy the PSLRA's heightened pleading requirements, a plaintiff must plead facts giving rise to a "strong inference" of fraudulent intent. To qualify as a "strong inference," the Supreme Court explained that "an inference . . . must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). In considering if a complaint meets the heightened requirements of the PSLRA, a court should consider the complaint in its entirety. The court's inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23.

Here, the amended complaint sufficiently alleges facts creating a "strong inference" of scienter with regard to Founders Grouf and Waxman. When taken as a whole, WPP sufficiently alleges fraudulent intent for purposes of surviving a motion to dismiss. South Ferry, 542 F.3d at 784.[4]

Founders Grouf and Waxman originally made little or no cash investment in Spot Runner. In contrast, in August 2006, WPP invested about $10 million into the Company. As part

---

[4]As we recently explained, "[u]nder *Tellabs* and Ninth Circuit law, we conduct a two-part inquiry for scienter: first, we determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, we conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011).

of the purchase, WPP negotiated the right to purchase additional shares, the right to notice, and an opportunity to participate in the sale of shares by any Founder under the ROFR/Co-Sale Agreement.

**[10]** The amended complaint alleges that the Founders knew of those notice requirements in the ROFR/Co-Sale Agreement and ignored them when selling their own shares as part of the May 2007 secondary offering. WPP says that the Founders did so because they knew that WPP would not continue to invest money into Spot Runner if WPP learned that the Founders were selling their own shares. WPP's continued investment was important because WPP had a strong industry reputation and because Spot Runner was losing thirty to forty million dollars per year. With these losses and with minimal operating income, Spot Runner allegedly needed continued infusion of investment capital. WPP also alleges that the Founders sought to divert needed capital from Spot Runner into their own pockets—by secretly selling their own shares—while still encouraging outside investors, such as WPP, to keep Spot Runner afloat.

To justify their refusal to alert investors that the Founders were selling their shares, the Founders say that WPP's right to receive notice of sales in subsection 3.1 of the ROFR/Co-Sale Agreement—which requires written evidence of a waiver of any provision of the Agreement—was itself waived by an interpretation of subsection 3.9 that allowed for sixty percent of the investors to agree together to waive the agreement. At best, this is a questionable interpretation of the Agreement. In making their defense, the Defendant-Appellees principally argue that the waiver and notice provisions in the ROFR/Co-Sale Agreement are ambiguous; that the Founders give a plausible reading of the Agreement that would allow Index and Battery to waive WPP's right to receive notice of Founder stock sales; and that compliance with a plausible reading of the Agreement prevents the Founders from having the requisite scienter. These arguments fail because the far more plau-

sible reading of subsection 3.9 requires any waiver to occur only after all investors have an opportunity to vote. The argument also completely disregards subsection 3.1's requirement that the Founders need provide "each Investor with written evidence that such requirements have been met or waived prior to consummating any sale."

Finally, if the May 2007 sale was a singular incident, WPP would face more difficulty adequately alleging scienter. When that sale is viewed in light of WPP's allegations that the Founders repeatedly ignored the requirements of the ROFR/Co-Sale Agreement to surreptitiously sell shares and that the Founders went to such great lengths to avoid disclosure of their sales, however, the alleged failure to give proper notice of the May 2007 sale looks much more like fraud. Simply described, the Founders' machinations to avoid giving notice of Spot Runner's poor performance and to avoid giving notice of the Founders share sales bespeaks a guilty knowledge. *See Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 970-71 (N.D. Cal. 2005) (stating alleged fraudulent statements made prior to the conduct subject to a securities class action can be taken into account when assessing scienter).

**[11]** When taken as a whole and accepting all well-pleaded allegations as true, WPP sufficiently alleges fraudulent intent for purposes of a motion to dismiss.

### iii. Loss Causation

**[12]** In order to state a securities fraud claim, a plaintiff must also allege that there was "loss causation," which is "a causal connection between the material [omission] and the loss." *Dura Pharm. v. Broudo*, 544 U.S. 336, 342 (2005); 15 U.S.C. § 78u-4(b)(4). That is, a plaintiff must ultimately prove that the defendant's omission was the proximate cause of its loss. *Dura*, 544 U.S. at 346. A plaintiff can plead loss causation by alleging that the share price fell significantly after the truth became known, or by alleging that the content

of the omissions caused his or her loss. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008); *Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 949 (9th Cir. 2005).

With a privately held company, a comparison of market stock price to establish loss causation has less relevance because market forces will less directly affect the sales prices of shares of a privately held company. *See, e.g.*, *Livid*, 416 F.3d at 944 n.2 (distinguishing *Dura* in closely held companies); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 434 & n.11 (3d Cir. 2007) (noting *Dura* has less application in a privately held corporation). In privately held companies, plaintiffs more commonly prove loss by showing that a misrepresentation or omission caused him or her to engage in a transaction and that the revelation of the truth is directly related to the economic loss alleged. *Livid*, 416 F.3d at 949 ("[Plaintiff] has sufficiently pled both elements of causation because it has alleged both that they would not have purchased the . . . stock but for the misrepresentation and that the Defendants' misrepresentation was directly related to the actual economic loss it suffered." (citing *McGonigle v. Combs*, 968 F.2d 810, 821 (9th Cir. 1992))).

It is unclear in this Circuit whether Rule 9(b)'s heightened pleading standard or whether Rule 8(a)(2)'s "short and plain" statement applies to allegations of loss causation. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1056 (9th Cir. 2008). However, it is unnecessary to decide that issue, because the amended complaint "offers 'sufficient detail to give defendants ample notice of [the] loss causation theory, and [gives] some assurance that the theory has a basis in fact.' " *Id.* (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989-90 (9th Cir. 2008)).

**[13]** WPP alleges that Founders' concealment of their own stock sales caused the loss. Specifically, WPP alleges that when Spot Runner revealed that the Founders had been

secretly selling their shares (while still encouraging outside investment), the shares it owned in Spot Runner immediately became worthless. WPP alleges, quite plausibly, that no investor would be willing to purchase its shares after the Founders' alleged "pump and dump" scheme became public knowledge. Although these allegations do not provide detailed share prices, the number of shares currently held, or whether attempts to sell the Spot Runner shares were made, the amended complaint includes a statement of loss causation sufficient to provide "some assurance that the theory has a basis in fact." *In re Gilead*, 536 F.3d at 1056. *See also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (finding similar allegations related to a "pump and dump" scheme sufficient); *LLDVF, L.P. v. Dinicola*, 2010 WL 3210613, at *9 (D.N.J. Aug. 12, 2010) (applying *Livid* and stating "to survive a motion to dismiss, Plaintiff need not allege facts identifying how much loss is attributable to its claim versus other factors so long as it alleges sufficient facts from which a reasonable fact-finder could find that some loss is attributable to the claim."); *Nathel v. Siegal*, 592 F. Supp. 2d 452, 467-68 (S.D.N.Y. 2008) (finding allegations sufficient where concealed facts induced investment); *Palladin Partners v. Gaon*, 2006 WL 2460650, at *14 (D.N.J. Aug. 22, 2006) ("[W]here private investors do not rely on a fraud-on-the-market theory, Plaintiffs need only establish that Defendants' misrepresentations were directly related to the actual economic loss suffered."); *Schuster v. Anderson*, 413 F. Supp. 2d 983, 1014-15 (N.D. Iowa 2005) (finding allegations defendants induced investment in company and lined own pockets with money, leading company to financial ruin, are sufficient).

**[14]** Thus, having found that WPP adequately alleges Rule 10b-5(b) omission claims for securities fraud against Founders Grouf and Waxman, we REVERSE the district court's dismissal of these claims.

*B.    Rule 10b-5(b) omission claim against Peter Huie*

**[15]** WPP also makes an omission claim under Rule 10b-5(b) against Defendant-Appellee Huie. At the time of the events in this case, Huie acted as the General Counsel of Spot Runner. The district court dismissed the Rule 10b-5(b) claim against Huie on the ground that Huie did not have a duty to disclose the Founders' sales to WPP. We now AFFIRM the district court on the separate grounds that scienter is not adequately alleged in the amended complaint as against Huie.

As previously discussed, in an April 17, 2007 letter, Spot Runner told WPP and other investors it was selling $32 million in common stock to an institutional investor as part of a new primary offering. This letter also asked other investors if they wanted to purchase their pro rata portion of this offering to maintain their ownership position. On May 10, 2007, Spot Runner sent WPP another letter about a potential secondary offering and told WPP that the new institutional investor wanted to purchase additional shares; the letter asked WPP if it wished to sell shares in the secondary offering.

On May 18, 2007, a lawyer for WPP sent Huie an email to confirm that the purchase of new shares in the primary offering would adequately maintain WPP's ownership interest. On May 21, Alexander Barry, another lawyer for WPP, initiated a new email chain with Huie, with the subject line "WPP Share Purchase." In this email, Barry specifically asked Huie is there "an existing investor and/or founder selling existing shares related to this offering? If so, who is selling shares and how many shares are they selling?" In response to the WPP attorney's question whether any existing investor was selling their shares in this offering, Huie replied, "[t]his offering does not involve the sale of any existing shares. It is an entirely new issuance by the Company."

**[16]** WPP says Huie purposely misled it in this email conversation because WPP sent the May 21 email to follow up

with Huie about the May 18 message, which had ended with a discussion of the secondary offering. WPP suggests Huie's response implied—even if not explicitly—that Founders were not making any secondary market sales to the institutional investor. WPP also says that the content of the question could only be referring to the secondary offering, that Huie must have realized this, and that he nonetheless purposely provided a misleading response intending to mislead. Responding, the Defendant-Appellees argue that the May 21 email was ambiguous regarding whether the question referred to the principal stock sale or the secondary offering and that the subject of the message, "WPP Share Purchase," gives the impression that WPP was asking about its own purchase of shares in the primary share offering and not the secondary offering.

As noted previously, under the PSLRA a plaintiff must plead specific facts supporting a "strong inference" that the defendant acted with scienter, 15 U.S.C. § 78u-4(b)(2), which is knowing, intentional, or reckless conduct " 'to the extent that it reflects some degree of intentional or conscious misconduct,' or what we have called 'deliberate recklessness.' " *South Ferry*, 542 F.3d at 782 (quoting *In re Silicon Graphics*, 183 F.3d at 977). To qualify as a "strong inference," the Supreme Court explained that "an inference . . . must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

The amended complaint fails to meet that rigorous standard. Although WPP offers one explanation for Huie's email response—an intent to defraud WPP by misleading it into believing that none of the Founders were selling shares in the secondary offering—this is not the only reasonable explanation for Huie's statement. Another plausible explanation is that Huie could have been confused whether WPP was asking about the primary or the secondary sale. Although it made no sense for WPP to ask if the Founders were selling shares as part of the primary offering, it also made little sense for an

email allegedly asking about the secondary offering to bear a title that more likely referred to the primary offering.

**[17]** WPP's allegation that scienter lay behind Huie's behavior is not the only plausible explanation for the email conversation, nor is it necessarily the most plausible. Perhaps the most plausible explanation for the answer was confusion, as Huie responded to an internally inconsistent email with a response that suggests he was talking about the primary offering. Accordingly, we now AFFIRM the district court's dismissal on this claim under Rule 12(b)(6).

## C. Omissions and Insider Trading Claims against Spot Runner

**[18]** WPP also brings omission and insider trading claims against Spot Runner under Rule 10b-5. The district court dismissed both claims, holding that WPP did not adequately allege scienter.

In support of its claims against Spot Runner, WPP says that on May 24, 2007, Spot Runner sold more than $1.7 million of shares to WPP in the primary offering, while failing to disclose that the Founders were selling their own shares in the secondary offering at the same time. WPP's allegations against Spot Runner tend to meld with the various allegations made against the individual Defendant-Appellees. WPP alleges that Spot Runner knew that the Founders were selling in the secondary offering at the time of WPP's participation in the primary offering and that Spot Runner purposely did not reveal this information to induce WPP into purchasing shares.

"[A] person violates Rule 10b-5 by buying or selling securities on the basis of material nonpublic information if (1) he owes a fiduciary or similar duty to the other party to the transaction; (2) he is an insider of the corporation in whose shares he trades, and thus owes a fiduciary duty to the corporation's

shareholders; or (3) he is a tippee who received his information from an insider of the corporation and knows, or should know, that the insider breached a fiduciary duty in disclosing the information to him." *S.E.C. v. Clark*, 915 F.2d 439, 443 (9th Cir. 1990) (citation omitted). A "corporate issuer in possession of material nonpublic information, must, like other insiders in the same situation, disclose that information to its shareholders or refrain from trading with them." *McCormick v. Fund Am. Cos.*, 26 F.3d 869, 876 (9th Cir. 1994).

The PSLRA heightened pleading standards for scienter also apply to insider trading claims. *United States v. Smith*, 155 F.3d 1051, 1068 (9th Cir. 1998); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1203 n.82 (C.D. Cal. 2008). Under the PSLRA, a plaintiff must plead specific facts supporting a "strong inference" that the defendant acted with scienter, 15 U.S.C. § 78u-4(b)(2), which is knowing, intentional, or reckless conduct " 'to the extent that it reflects some degree of intentional or conscious misconduct,' or what we have called 'deliberate recklessness.' " *South Ferry*, 542 F.3d at 782 (quoting *In re Silicon Graphics*, 183 F.3d at 977). As explained, to qualify as a "strong inference," "an inference of scienter must be more than merely plausible or reasonable— it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

**[19]** Here, we find that WPP fails to allege a cogent scienter theory explaining why Spot Runner would enable the Founders' "pump and dump" scheme. To a large extent, WPP's allegations against the Founders, which allege that the Founders sold shares in the secondary offering even though the sale was detrimental to the Company and the Investors, weaken WPP's allegations against Spot Runner. For example, WPP alleges that the Founders "diverted tens of millions of dollars away from the Company and into [their own] pockets at a time when the Company was entirely reliant on private investment capital to survive," the Founders "line[d] their own pockets rather than bring in needed capital to the Com-

pany, and that all of the shares of Spot Runner became "worthless" once the scheme became widely known. Thus, WPP describes Spot Runner as being disadvantaged when Founders Grouf and Waxman made secondary market sales. Against this backdrop, an inference of scienter is no more compelling as any opposing inference of non-fraudulent intent. Indeed, the Founders' alleged plot served both to divert badly needed capital from the Company during a time that Spot Runner needed the capital and to also reduce the demand for newly issued shares on the open market. Because Spot Runner is a corporate entity distinct from the Founders, the Founders' motivation to commit fraud cannot be automatically ascribed to the Company, particularly where the alleged behavior is at odds with the Company's financial interests.

[20] Although WPP offers one explanation for Spot Runner's behavior—intent to defraud—this explanation for the Company's behavior is not the most plausible. Rather, the allegations in the Amended Complaint tend to paint Spot Runner as a victim of the Founders' behavior, rather than as a potentially culpable perpetrator of fraud. Accordingly, we find that WPP does not adequately allege the scienter element of claims for Rule 10b-5 insider trading or actionable omission against Spot Runner and we AFFIRM the dismissal of these claims against this Defendant.

## D.   Rule 10b-5 Fraudulent Scheme

[21] WPP also pleads a Rule 10b-5(a) and (c) scheme liability claim against all Defendants. WPP alleges that the "Defendants carried out a plan, scheme and course of conduct which was intended to and did deceive WPP into continuing to invest in and support [Spot Runner] by concealing from WPP that the Founders of the Company and other Defendants were selling off their shares in large quantities." Specifically, WPP says the Founders participated in the scheme by failing to disclose their sales under the ROFR/Co-Sale Agreement; that Peter Huie participated in the scheme when he failed to

disclose the Founders' sale in the May 18 and 21 email exchanges; and that Spot Runner participated in the scheme by failing to disclose the Founders' sales of shares. The district court dismissed this claim without prejudice because it was repetitive of the Rule 10b-5(b) omission claim.

Under Rule 10b-5(a) or (c), a defendant who uses a "device, scheme, or artifice to defraud," or who engages in "any act, practice, or course of business which operates or would operate as a fraud or deceit," may be liable for securities fraud. 17 C.F.R. § 240, Rule 10b-5; *see also Stoneridge*, 552 U.S. at 158. By contrast, "[o]missions are generally actionable under Rule 10b-5(b) . . . [and] stem from the failure to disclose accurate information relating to the value of a security where one has a duty to disclose it." *Desai*, 573 F.3d at 940 (citing *Paracor*, 96 F.3d at 1157). Courts have generally held that "[a] Rule 10b-5(a) and/or (c) claim cannot be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim." *Lautenberg Found. v. Madoff*, 2009 WL 2928913, at *12 (D.N.J. Sept. 9, 2009); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) ("[W]here the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c).").

Although we have not squarely addressed the issue of whether allegations underpinning a Rule 10b-5(b) omissions claim may be recast as Rule 10b-5(a) or (c) scheme liability claim, in *Desai* we suggested, in accord with other courts, that it is not permissible. 573 F.3d at 941. In so holding, we emphasized the importance of maintaining a distinction among the various Rule 10b-5 claims from one another, writing that the lines dividing the different claims are a "carefully maintained" and are "well-established." *Id.*

**[22]** We now affirm that holding and expressly extend it to the current situation. A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and

omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions. *See S.E.C. v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 359 (D.N.J. 2009); *S.E.C. v. Patel*, 2009 WL 3151143, at \*6-7 (D.N.H. Sept. 30, 2009); *In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, 2006 WL 469468, at \*21 (S.D. Ohio Feb. 27, 2006) (holding theory of recovery that "merely repeats the allegations made in support of . . . misrepresentation and omission claim" is not a valid claim under Rule 10b-5(a) or (c)); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005).

**[23]** Here, WPP does not allege any facts that are separate from those already alleged in their Rule 10b-5(b) omission claims. The fraudulent scheme allegedly involved the Defendant-Appellees planning together to not disclose the Founders' sale of securities in the secondary offering, and then not disclosing those sales; fundamentally, this is an omission claim. *Cf. Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 237 (D. Mass. 2004) (finding allegations sufficient where defendant, in addition to issuing misleading investor reports, worked extensively to boost company's market price artificially through activities that were not omissions). Thus, we now find that the district court properly dismissed the scheme liability claim and we AFFIRM the dismissal.

## E.   Dismissal Without Prejudice

**[24]** The Defendant-Appellees also cross-appeal the district court's decision to dismiss certain claims in the amended complaint without prejudice under Rule 12(b)(6).[5] Having

---

[5]As a preliminary matter, the Court notes that the dismissal of the claims without prejudice was made under Rule 12(b)(6), and not Rule 41(a)(2) as the Defendant-Appellees suggest. Judge Gee's ruling dismissing the amended complaint without prejudice expressly incorporated the earlier decision in which Judge Anderson granted the Defendant-Appellees' motions to dismiss under Rule 12(b)(6) and that specified which claims could be amended or not. However, as a practical matter, the standard of review for the district court's decision to dismiss with or without prejudice does not change under either rule.

reversed the district court on several grounds, we review only those claims that the district court dismissed without prejudice and we have affirmed—the scheme liability claim and the insider trading claim. We find that it was not an abuse of discretion to dismiss these claims without prejudice. District courts have broad discretion in deciding whether to grant leave to amend and whether to dismiss actions with or without prejudice. *See Read-Rite*, 335 F.3d at 845. Moreover, we frequently review dismissals without prejudice for failure to state a claim where a plaintiff elects not to amend and appeal standing on the complaint. *See, e.g.*, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1107 (9th Cir. 2010) (reviewing a district court's dismissal without prejudice under Rule 12(b)(6) in a securities action after the plaintiff elected to not amend complaint and appeal). Although a dismissal with prejudice would have been more consistent with the instructions in *Edwards v. Marin Park, Inc.*, where we stated the proper course of action where a plaintiff elects to not amend their complaint and immediately appeal is an order of dismissal with prejudice, we did not phrase this as a mandatory rule and did not purport to supplant the district courts long-standing discretion to dismiss complaints with or without prejudice. 356 F.3d 1058, 1064 (9th Cir. 2004) ("[T]he District Court should have taken the election not to amend at face value, entered a final judgment dismissing all claims with prejudice, and allowed the case to come to us on appeal in that posture.").[6] Here, the dis-

---

[6]Moreover, although this dismissal was under Rule 12(b)(6), the case law analyzing voluntary dismissals for the purpose of taking an immediate appeal under Rule 41(a)(2) is a useful guide here for determining whether the district court's dismissal was an abuse of discretion. Under that Rule, district courts also enjoy discretion to dismiss claims with or without prejudice. *See Diamond State Ins. Co. v. Genesis Ins. Co.*, 379 F. App'x 671, 673 (9th Cir. 2010); *Romoland Sch. Dist. v. Inland Empire Energy Ctr. LLC*, 548 F.3d 738, 747-51 (9th Cir. 2008); *Smith v. Lenches*, 263 F.3d 972, 974 (9th Cir. 2001). Where the request is to dismiss without prejudice, "[a] District Court should grant a motion for voluntary dismissal under Rule 41(a)(2) unless a defendant can show that it will suffer some plain legal prejudice as a result." *Smith*, 263 F.3d at 975 (citing *Waller v. Fin. Corp. of Am.*, 828 F.2d 579, 583 (9th Cir. 1987)). Legal prejudice

trict court acted within that discretion in dismissing these claims without prejudice.

More broadly, we also note that under Rule 54(b), an interlocutory order that "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b); *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (9th Cir. 2003) (stating that a district court retains the power to modify rulings on partial dispositive motions); *United States v. Martin*, 226 F.3d 1042, 1048-49 (9th Cir. 2000) (stating that until final judgment is entered that a district court has the "inherent jurisdiction to modify, alter, or revoke" interlocutory decisions). Here, where some claims survive a motion to dismiss, the district court, in its discretion, has power to allow an amended complaint even with regard to claims that it earlier dismissed. Although not common, this procedure would be appropriate should discovery reveal evidence indicating that previously dismissed Defendants were in fact involved in the alleged fraudulent conduct. *See Nunes v. Ashcroft*, 375 F.3d 805, 807-08 (9th Cir. 2004) (granting motion to reconsider appropriate when "presented with newly discovered evidence"). To some extent, the ability of a district court to revive dismissed claims should evidence come to light tempers the heightened pleading standards of the PSLRA in securities actions where claims survive against co-defendants.

---

does not result merely because a defendant will be inconvenienced by potentially having to defend the action in a different forum or because the dispute will remain unresolved. *Smith*, 263 F.3d at 976; *Westlands Water Dist. v. United States*, 100 F.3d 94, 96 (9th Cir. 1996). Here, the only prejudice that the Defendant-Appellees claim is the risk of having to defend this action again. Having considered that argument, the district court properly rejected it.

## IV.    Conclusion

We AFFIRM IN PART and REVERSE IN PART the district court's dismissal for failure to state a claim and REMAND for further proceedings consistent with this opinion. First, we AFFIRM the dismissal of the Rule 10b-5(a) and (c) fraudulent scheme claim against all of the Defendants, the dismissal of the Rule 10b-5(b) fraudulent omissions claim against Peter Huie and Spot Runner, and the dismissal of the Rule 10b-5 insider trading claim against Spot Runner. Second, we REVERSE the dismissal of the Rule 10b-5(b) omission claims against Nick Grouf and David Waxman. The parties shall bear their own costs on appeal.